**CLEEK AVIATION, an Oklahoma corporation, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 426–88C.**

United States Claims Court.

Feb. 26, 1990.

Rocklin D. Lyons, Oklahoma City, Okl., for plaintiff.

Margaret Lee Baskette and Jeanne A. Anderson, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant. Kathleen A. Murphy, Asst. Counsel, Defense Fuel Supply Center and Lt. Col. Bill Smith, Trial Atty., Office of the Judge Advocate General, U.S. Air Force, of counsel.

## OPINION

MARGOLIS, Judge.

This government contracts case is before the court on cross motions for summary judgment. Plaintiff alleges $4,680,000 in damages when the government breached its requirements contract by using other suppliers for fuel for the Air Force's "Mighty Force" military exercises. After a careful review of the entire record, and after hearing oral argument, this court concludes that the government did not breach the contract. Therefore, the defendant's motion for summary judgment is granted, and the plaintiff's motion for summary judgment is denied.

## FACTS

On September 30, 1986, the Defense Logistics Agency, on behalf of the Defense Fuel Supply Center (DFSC), awarded Contract No. DLA 600–86–D–0332 to Cleek Aviation (Cleek). The two-year contract required Cleek to supply JP–4 jet fuel and refueling services for military aircraft at Clinton–Sherman Airpark in Burns Flat, Oklahoma. The contract states that it is a requirements contract. DFSC estimated that 1.6 million gallons of fuel would be required over the life of the contract. In fact, the government purchased approximately 1.5 million gallons of fuel from Cleek under the contract.

The government paid Cleek a unit price per gallon of fuel which consisted of the reference price of the fuel (which was defined as the cost of the fuel to Cleek) plus a $.26 per gallon "into-plane fee." The reference price was allowed to fluctuate according to the cost of the fuel. At the time of the contract award, the unit price of the fuel to DFSC was $.895 per gallon ($.635 per gallon reference price and $.26 into-plane fee).

The contract stipulated that the fuel would be delivered "f.o.b. aircraft tanks." That is, delivery of fuel was considered complete when Cleek actually refueled an aircraft. Incorporated into the contract was Military Standard 1548A, which sets forth in detail the various technical require-ments of an into-plane fuel contract. These requirements include, among other things, daily, monthly and semi-annual equipment inspection and testing, detailed procedures for fueling and defueling aircraft, contaminant testing, and safety requirements.

In July 1987, about nine months after Cleek's contract had been awarded, the Air Force began preparing for a "Mighty Force" training exercise at Clinton–Sherman. The exercise was intended to develop the capability to deploy and operate aircraft from austere forward operating locations. Training was designed to simulate wartime conditions, in which Air Force flight personnel would have to perform refueling services with minimal ground support. Fuel for the refueling exercises was to be stored in "bladders," large portable fuel storage tanks, until flight personnel refueled aircraft during the exercise. During 1987 and 1988, the Air Force conducted several "Mighty Force" exercises at Clinton–Sherman. In total, these exercises required approximately 16 million gallons of JP–4 fuel.

In August 1987, prior to the first exercise, the DFSC inquired whether Cleek had the capacity to supply the estimated 20 million gallons of fuel required for the Mighty Force exercises. Although that amount represented more than 1,000% of the contract estimate, Cleek indicated that it could supply the fuel for the exercises with a minimum amount of lead time. Cleek was cautioned that the inquiry was only preliminary, and was told not to make any commitment to its suppliers based on the Air Force inquiry.

The Air Force determined that, because the exercises would not require Cleek's refueling services, the exercises were not within the scope of Cleek's into-plane contract. Therefore, without further negotiations with Cleek, the DFSC used "bulk fuel contracts" (i.e., contracts which included no refueling services) with other suppliers for the Mighty Force exercises.

Cleek claims that, under Clause B15.01(b) of the contract, Cleek had the right to supply the fuel for *all* refueling of military aircraft at Clinton–Sherman during the two

years of the contract. The defendant argues that the fuel requirements of the Mighty Force exercises were outside of the scope of the into-plane contract; therefore, the defendant's use of bulk fuels contracts with other suppliers during the contract period did not represent a breach of Cleek's requirements contract.

## DISCUSSION

### Contract Interpretation

■ There is no dispute that the contract between Cleek and DFSC is a requirements contract. The Court of Claims has defined a requirements contract as "a contract in which the purchaser agrees to buy all of its needs of a specified material from a particular supplier, and the supplier agrees, in turn, to fill all of the purchaser's needs during the period of the contract." *Media Press, Inc. v. United States,* 215 Ct.Cl. 985, 986, 566 F.2d 1192 (1977) (citations omitted). A party breaches a requirements contract when it orders supplies or services *of the type contracted for* from another supplier. *Hemet Valley Flying Service Co. v. United States,* 7 Cl.Ct. 512, 516 (1985) (emphasis supplied); *Ralph Construction, Inc. v. United States,* 4 Cl.Ct. 727, 731 (1984).

The issue before the court is whether the 16 million gallons of JP–4 fuel for the Mighty Force exercises were within the scope of Cleek's into-plane fuel contract. Cleek maintains that the contract gave Cleek the exclusive right to supply all fuel and/or refueling services required by military aircraft at Clinton–Sherman Airport. The defendant maintains that Cleek's contract covered only fuel delivered in conjunction with the refueling services described in the contract. If, as plaintiff claims, the 16 million gallons of fuel *were* within the scope of the contract, then the DFSC breached the requirements contract when it used other suppliers. If the 16 million gallons of fuel were *not* within the scope of the contract, then the DFSC did not breach its requirements contract with Cleek.

■ It is well settled that contract interpretation is a matter of law. *Dynamics*

*Corporation of America v. United States,* 182 Ct.Cl. 62, 71–72, 389 F.2d 424, 429 (1968). Interpretation of this contract can be divided into three parts: 1) the supplies and services subject to the contract; 2) the price structure of the fuel under the contract; and 3) the effect of the estimated quantity term under the contract.

1. *Supplies and Services Subject to the Contract*

■ The clauses in dispute are set forth below, with the critical language emphasized. Clauses B15.01 and I84(F) of the contract state in pertinent part:

B15.01 INTO–PLANE SCHEDULE OF SUPPLIES AND ESTIMATED QUANTITIES

(a) ... With respect to the products and/or services listed at each individual airport location included in this contract, the Contractor is obligated to deliver the supplies and perform the services required for such location, and the Government shall be obligated to order, accept and pay for such supplies and/or services even though the quantities actually required during the contract period may be greater or less than the estimated quantities, as provided for in Clause I84 entitled "REQUIREMENTS."

(b) *Unless otherwise specified below,* the Contractor shall perform *all refueling services at his established facility.*

I84(F) REQUIREMENTS

(b) ... *Subject to any limitations in the Delivery–Order Limitations clause or elsewhere in the contract,* the Contractor shall furnish to the Government all supplies or services specified in the Schedule....

Clauses F31 and F56 state in pertinent part:

F31 DELIVERIES

(b) Delivery shall be made *f.o.b. aircraft tanks* of U.S. designated aircraft ... *except as noted elsewhere.*

F56 GENERAL DELIVERY CONDITIONS FOR INTO–PLANE CONTRACTS

(d) The Contractor shall, at the request of the Ordering Officer, *deliver the supplies to be furnished or serviced hereunder into aircraft tanks* of U.S. designated aircraft or defuel therefrom.

Clause B15.01(b) states that "[u]nless otherwise specified below, the Contractor shall perform all refueling services at his established facility." Cleek argues that this clause, together with Clause I84(F), requires the government to purchase from Cleek all of the JP–4 fuel necessary to refuel all military aircraft at Clinton–Sherman, regardless of whether Cleek's refueling services are required. In other words, Cleek argues that the important phrase in the clause is "all refueling services." Plaintiff urges the court to read clauses B15.01 and I84(F) as overriding Clauses F31 and F56. Plaintiff argues that to interpret those clauses as designating aircraft tanks as the only authorized final delivery point would be to ignore the language of Clause B15.01.

Defendant urges the court to adopt a different interpretation. Under the government's reading of the contract, Clause B15.01(b) refers to the location within the airport at which Cleek was required to perform its refueling services. In other words, defendant argues that the import of that clause is to require Cleek to refuel aircraft "at [Cleek's] established facility." Defendant argues that "established facility" cannot be read to mean the entire Clinton–Sherman airport, but rather encompasses only Cleek's building at that airport. Further, defendant argues that the delivery clauses, F31 and F56, establish Cleek's contractual obligation to "deliver" the fuel directly into the aircraft tanks: that is, to perform refueling services.

Fundamental principles of contract interpretation require that the contract be interpreted as a harmonious whole, *Cedar Lumber, Inc. v. United States*, 13 Cl.Ct. 547, 551 (1987), *aff'd*, 857 F.2d 765 (Fed.Cir. 1988), with no part of the contract being overemphasized to the exclusion of other parts. *Abe L. Greenberg Company, Inc. v. United States*, 156 Ct.Cl. 434, 439–40, 300 F.2d 443, 446 (1962). Plaintiff ignores the limiting language appearing in both clauses cited in support of its position. Clause I84(F)(b) indicates that the contractor shall furnish all supplies *subject to limitations in the contract.* Clause B15.01(b) indicates that the contractor shall perform all refueling services at his facility, *unless otherwise specified below.*

The meaning of clause B15.01 is clarified by the Schedule which is incorporated into Cleek's contract. Cleek's contract at Clinton–Sherman was just one of many into-plane requirements contracts entered into by the government with suppliers at different airports. The Schedule lists all of the airports to be covered under into-plane refueling contracts and, where applicable, lists modified requirements for particular airports. This is the Schedule to which Clause B15.01(b) refers when it states, *"[u]nless otherwise specified below, the Contractor shall perform all refueling services at his established facility."* (Emphasis supplied.)

Where the contract required a contractor to supply services with different requirements or in excess of the basic requirements, such was noted in the Schedule. Examples of the types of modifications in the Schedule for airports other than Clinton–Sherman include servicing at ramps and locations other than the contractor's established facility, the fueling of army tank trucks, the provision of gas for individual purchase by U.S. government personnel, etc.

The Schedule also lists modifications of delivery where a contractor was required to provide a different type of service or provide service at a location other than its established facility. For example, one notation required a contractor to supply fuel in support of aircraft training at a nearby base. (Schedule Item No. 4904). The only notation pertaining to Clinton–Sherman is the requirement that JP–4 fuel was required. Therefore, the subject contract covered only JP–4 fuel delivered f.o.b. aircraft tanks at Cleek's established facility.

Cleek suggests that the language of Clause B15.01 extends its contract to include delivery of fuel to locations (in this

case, fuel bladders) other than those listed in the contract even where no exception is listed. Plaintiff's interpretation is in contravention of the clear meaning of the clause requiring that delivery be made f.o.b. aircraft tanks *except as noted elsewhere*. There are instances in which delivery other than to aircraft tanks is acceptable under the terms of the contract—where the deviation is noted in the Schedule. Here, there is no such notation.

A contract should be interpreted so as to give meaning to all its provisions, leaving no clauses of the contract meaningless. *Mason v. United States*, 222 Ct.Cl. 436, 445, 615 F.2d 1343, 1347–48, *cert. denied*, 449 U.S. 830, 101 S.Ct. 98, 66 L.Ed.2d 35 (1980). Cleek's interpretation would render Clause B15.01(b) meaningless and superfluous. The government's contention that the contract covered only into-plane fueling services—and not bulk delivery of fuel without those services—is the more reasonable and harmonious interpretation.

■ It is telling to compare the requirements of Cleek's into-plane contract with those of the government's bulk fuel contract with the other suppliers, because the comparison illustrates how much the two types of contracts differ. The government is not in breach of a requirements contract where the second contract is for essentially different services. *Eastern Ambulance Services, Inc.*, VABCA No. 2078, 86–2 B.C.A. (CCH) ¶ 18,852. In *Eastern Ambulance*, a contract to provide ambulance service, which included emergency medical technicians and equipment to treat emergency patients, was identified as significantly and essentially different from a contract which required neither emergency medical technicians nor emergency equipment. The Veterans Administration Board of Contract Appeals found that Eastern's contract did not give it the right to transport *all* patients, including those who had no need of the extra medical services that the contractor was required to perform under the terms of its contract. *Id.* at 94,999–95,000.

As in *Eastern Ambulance*, the contracts in this case cover essentially different services. The into-plane contract required the contractor to perform refueling and defueling services, whereas the bulk fuels contract required the contractor only to supply fuel. A bulk fuels contract is a contract for fuel only; an into-plane contract is a contract for fuel coupled with services. The into-plane contract required the fuel to be properly delivered into the aircraft tanks, which is significantly different than delivering fuel to large portable storage tanks, from which the purchaser must perform refueling tasks. Since the latter services contracted for by the defendant were significantly different, the defendant did not breach its contract with Cleek by using other fuel suppliers for the military exercises.

### 2. Price Structure Under the Contract

Furthermore, the price structure of the contract demonstrates that the parties contemplated that Cleek would provide refueling services for every gallon of fuel it supplied. Under the terms of the contract, Cleek was to be paid for the cost of the fuel *plus* a $.26 into-plane fee. The fee covered Cleek's costs of labor, overhead and profit. There was no provision in the contract setting a price for fuel supplied in the absence of refueling services. Neither party contemplated Cleek's provision of fuel without the into-plane service.

Cleek states that a primary purpose of an into-plane contract is to allow the government to ensure that fuel is available with qualified personnel to refuel government aircraft. Plaintiff further states that the government's specification of the delivery point as f.o.b. aircraft tanks is to prevent a contractor from claiming that its only obligation is to supply fuel to the airport, thus necessitating refueling by government personnel. Yet this is precisely what Cleek is claiming: that even when its services, personnel and equipment were unneeded, it should have received the into-plane fee for merely delivering fuel to the airport. The plaintiff's interpretation would require the government to pay the full, into-plane price per gallon of fuel even when it received no into-plane services.

Cleek is not entitled, under the contract, to such a windfall.

### 3. *Estimated Quantity Under the Contract*

■ Defendant argues that the tremendous increase in fuel over and above the contract estimate of 1.6 million gallons of fuel indicates that the requirements for the military exercises were not intended to be part of the contract. An error in estimation in a requirements contract will not relieve either the government or the contractor from its obligations under the contract. So long as the estimate was made in good faith, the parties must perform. *Carstens Packing Co. v. United States*, 52 Ct.Cl. 430, 435 (1917). No bad faith is alleged here. Therefore, *if* the military exercises fell within the scope of the contract, the government would be bound to purchase its fuel requirements from Cleek so long as Cleek was willing and able to perform.

■ Defendant is correct when it asserts that the contractor might have been excused from performance because the government orders were excessive. *Allied Paint Manufacturing Co. v. United States*, 200 Ct.Cl. 313, 331, 470 F.2d 556, 567 (1972). Here, however, the contractor does not seek to be excused; rather it sought performance from the government and now seeks damages resulting from the government's alleged failure to perform. Thus the fact that the actual fuel required far exceeded the government's estimate does not, by itself, lead to the conclusion that the excess fuel requirements were outside the scope of the contract.

However, a contract must be interpreted to carry out the intention of the parties as manifested by the contract as a whole. *Alvin, Ltd. v. United States Postal Service*, 816 F.2d 1562, 1565 (Fed.Cir.1987); *Kenneth Reed Construction Corp. v. United States*, 201 Ct.Cl. 282, 288, 475 F.2d 583, 586 (1973). The fact that the estimate for the into-plane contract was so low in relationship to the quantity of fuel needed for the Mighty Force exercises is *some evidence* that the parties did not intend to include the exercises within the scope of the contract. That evidence, taken together with the facts that 1) the Air Force did not decide to conduct the Mighty Force exercises at Clinton–Sherman until nine months after the contract was awarded to Cleek, and 2) the exercises *required no refueling services*, is further support for this court's conclusion that the fuel supply needed for the Mighty Force exercises fell outside the scope of Cleek's into-plane contract.

### CONCLUSION

Summary judgment is appropriate where there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). Here, the only dispute between the parties is contract interpretation, a matter of law.

This court concludes that the defendant has shown that the bulk fuel requirements for the Mighty Force exercises were not within the scope of its existing into-plane fuel services contract with Cleek Aviation. Because the additional bulk fuel requirements fell outside the scope of the contract, the government did not breach its contract with Cleek when it acquired fuel for the exercises from other suppliers.

For the reasons set forth above, the defendant's motion for summary judgment is granted, and the plaintiff's motion is denied. Accordingly, the Clerk will dismiss the complaint. Each party will bear its own costs.